UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

SAUNDRA FREEMAN,

               Plaintiff,

      vs.

LEARNING CARE GROUP,

               Defendant.

_____/

Case No. 18-CV-13720

HON. GEORGE CARAM STEEH

ORDER GRANTING IN PART AND DENYING IN PART
<u>DEFENDANT'S MOTION FOR SUMMARY JUDGMENT [ECF NO. 38]</u>

     This employment action was filed by plaintiff Saundra Freeman against her former employer, defendant Learning Care Group ("LCG"). Freeman's complaint alleges discrimination, harassment and retaliation under the Americans with Disabilities Act of 1990 ("ADA") and the Family and Medical Leave Act ("FMLA"). The matter is before the court on LCG's motion for summary judgment (ECF No. 38).[1] Upon a careful review of the written submissions, the court deems it appropriate to render its decision without a hearing pursuant to Local Rule

---

[1] This case previously came before the court on defendant's motion for partial summary judgment (ECF No. 10) on the issue of whether certain claims were untimely under the terms of plaintiff's employment contract. That motion was ultimately denied (ECF Nos. 14, 16) and the parties proceeded to engage in discovery. The court granted defendant's motion for leave to file multiple motions for summary judgment (doc. 9).

7.1(f)(2).  For the reasons set forth below, defendant's motion for summary judgment is granted in part an denied in part.

FACTUAL BACKGROUND

LCG is a national early childhood education company with over 900 early childhood centers across the country.  LCG's headquarters is known as Support Central and is located in Novi, Michigan.  The office provides support services to its centers (or "schools"), including customer services, finance and accounting, payroll and benefits, and IT.  Saundra Freeman began her job as an Accounts Receivable Specialist with LCG on September 4, 2007.  In November of 2011, Freeman was promoted to Subsidy Operations Analyst, a position she proposed to create, where she was responsible for managing third-party finance operations for subsidized and private pay childcare tuition.  The facilities Freeman serviced were in Texas and on the east coast.  In 2013, Amanda Davis became Freeman's manager.  Ms. Davis testified that Freeman was considered a subject matter expert for subsidy analysis.  (Davis dep., 61, 62).

In November 2015, LCG began a renovation at the Novi office with the goal of creating a collaborative environment.  The office was restructured to favor communal spaces rather than individual offices.  (Kathy Raglin, dep., 23).  At the time, Barbara Beck was the Chief Executive Officer of LCG and she was a

staunch supporter and advocate of in-person attendance in the workplace and "wanted the collaboration to happen in house."  (Michelle Kolodziej, dep., 92).

At the beginning of the renovation, Freeman and her co-workers were moved to the first floor and allowed to work from home three days a week. Freeman, who has asthma, did not experience any ill effects from the construction during this period.  (Freeman dep., 202).  On September 12, 2016, after she was moved back to the third floor, Freeman reported to her manager, Amanda Davis, that she felt that she was "flaring up" due to the construction. (Freeman dep., 206).  Davis permitted Freeman to leave the office and work from home.

On September 15, 2016, Freeman visited her primary care provider, Dr. Amy Goldfaden.  Dr. Goldfaden wrote a note indicating Freeman was having a "severe exacerbation of her asthma, . . . triggered by dust, chemicals, and other external allergens that she was exposed to at work."  Dr. Goldfaden stated that Freeman could work offsite but requested she "not return to work until construction finished."  (ECF No. 43-4, PageID.1666).  Freeman used paid time off and occasionally worked from home.

On October 4, 2016, Freeman requested a leave of absence under the FMLA beginning September 30, 2016.  Freeman's FMLA request was approved the next day based on the medical report of pulmonologist Dr. Marc Dunn (ECF

No. 38-5 and 38-6).  LCG approved Freeman for the full 12 weeks available under the FMLA.

Freeman took continuous FMLA leave until November 29, 2016.  She then voluntarily attempted to return to work and switched to intermittent FMLA leave.  Freeman also requested to work remotely on an intermittent basis as renovations continued, to assist in her gradual return to work in the office. (Freeman dep., 236-239, 246].  Freeman admits LCG provided her with all of the FMLA leave she requested and did not discriminate against her or fail to accommodate her disability in any way from September 30, 2016 through November 28, 2016.  (Freeman dep., 233-234, 236-240).

On January 16, 2017, Freeman requested LCG allow her to work from home on a full-time basis until the office renovation was complete.  This request was supported by a note from her primary care provider.   LCG approved Freeman's request with the understanding that "this arrangement will be evaluated weekly based on construction" and that "further evaluation to work remotely once construction is complete will be reviewed at that time in conjunction with doctor's instructions."  (ECF No. 38-7, PageID. 613).  Freeman admits this was her understanding of the arrangement as well.  (Freeman dep., at 242).  In addition to allowing her to work remotely during the renovation,

Freeman's supervisor Davis held team meetings off-site to allow Freeman to attend in person. (Freeman dep., at 197).

By February 2017, a significant phase of the office renovation was complete. As a result, LCG expected Freeman to return to the office. However, on February 15, 2017, Freeman visited Dr. Goldfaden on an emergent basis with "acute wheezing". Dr. Goldfaden opined, "at this time it is not in [Freeman's] best medical interest to return to the office building. She will need an alternative work space." (ECF No. 43-6, PageID. 1671). Based on Dr. Goldfaden's medical opinion, LCG agreed Freeman could continue to work remotely until the remaining renovation projects were completed. (ECF No. 38-10).

On August 25, 2017, LCG informed Plaintiff she was expected to return to work, in the Novi office, on August 28, 2017 as the renovation was complete. (Freeman dep., 253-54). Freeman returned to the office on August 28, 2017. On that day she expressed her frustration to manager Jennifer Beers that she was not consulted about her medical condition before her accommodation was terminated. (Freeman dep, 254-55, 260). After spending a short time in the office, Freeman reported to Beers that she experienced shortness of breath and had to leave the building. (Freeman dep, 254, 257, 261). On August 29, 2017, Freeman met with Beers, LCG Human Resources Manager Michelle Kolodziej and Jackie Giusta and was told she needed to submit a new doctor's note and

new ADA reasonable accommodation forms so they could understand her condition, why she needed an accommodation, and what accommodations were medically necessary. (Freeman dep, 261-265).  LCG permitted Freeman to work from home until she submitted the required forms.

On August 31, 2017, Freeman submitted the reasonable accommodation forms and a doctor's note based on her visit with pulmonologist Dr. Marc Dunn.[2] Dr. Dunn's note stated that Freeman's "work environment is a consistent trigger for her asthma.  Saundra should not be around aerosols, dusts, or fumes."  (ECF No. 38-12, PageID.634).

On September 20, 2017, Plaintiff submitted to an Independent Medical Examination ("IME") in relation to a workers' compensation claim. The IME, Dr. Bernick, concluded it was unlikely Freeman had any significant or toxic exposure to an airborne chemical in the office or that she had an impairment to disable her form her usual work.  (ECF No. 38-13, PageID.643).  In October 2017, LCG commissioned an air quality test of the Novi office based on symptoms reported by two employees.  The report recognized possible indoor air quality issues, concluded in part:

> Occupant description of odor and symptoms are likely a cumulative affect from multiple, rather than singular, indoor air quality issues. Notably, no single issue identified represents a clear or immediate danger to human health.  Further, the description of the discomfort

---

[2] The documents were illegible and were re-submitted on October 5, 2017.

and ill-health symptoms are often due to issues not related to insufficient indoor air quality in the building, such as stress, exposure to contaminants in other environments, and hypersensitivity issues.

However, conditions do exist in the building that may affect indoor air quality.  Modifications of the layout, design, and/or function of the HVAC system is likely the primary issue related to perceptions of IAQ [indoor air quality] in the building.

(ECF No. 38-14, PageID.652).

On October 13, 2017, Freeman met with LCG Vice President of Human Resources Kathy Raglin and Kolodziej to discuss her request to continue to work remotely.  LCG offered Freeman numerous accommodations, such as purchasing her an air purifier and cleaning her workstation daily.  Michelle Kolodziej contacted Dr. Dunn on October 16, 2017 to further understand his recommendations.  According to Kolodziej's own notes, Dr. Dunn stated that an "alternative workspace would be the best idea", that Freeman "is clearly agitated by something in the air", and while he "can not prove what that is", "there is swelling on the lung".  (ECF No. 43-11, PageID.1698).  Freeman asked that she be permitted to work at home for six months to give the building time to air out to see if her asthma would not be triggered.

LCG denied Freeman's request for an accommodation based on the lack of supportive medical documentation, the IME Report, air quality testing report, and LCG's regular in-person attendance policy.  LCG offered other accommodations intended to address her medical documentation, such as providing an air purifier

and cleaning her workstation daily.  On November 3, 2017, LCG informed
Freeman she was expected to return to the office on November 6, 2017.  With
the understanding that LCG was not going to permit her to work remotely,
Freeman described a possible safe workspace as being one that did not contain
new materials and had a separate air supply.  Freeman testified she did not
believe this would be an effective solution but felt pressured to provide an in-
office suggestion.  (Freeman dep., 308-10)  In response, LCG agreed to provide
Freeman with a converted conference room for her to use as an office.

On November 6, 2017, Dr. Dunn's office wrote a letter upon Plaintiff's
request, indicating that while he recommended Plaintiff continue the current
telework status, if this accommodation could not be provided to "please let
Saundra Freeman know so we can discuss alternatives." (ECF No. 38-19,
PageID.667).  Dr. Dunn testified at his deposition that accommodations could
possibly have been made for Freeman other than working on a "telework status."
(Dunn dep., 55, 59-60).

On November 15, 2017, Plaintiff requested intermittent FMLA leave. LCG
approved this leave, which expired March 2, 2018.  At that time, Freeman made
a request for an extension of FMLA which was denied.  Freeman returned to the
office on February 28, 2018 after construction of her modified office space was
completed. However, after working in her new office for a few hours on February

28 and March 2, 2018, she experienced shortness of breath and chest tightening. (Freeman dep., 316-17).  On March 2, 2018, Freeman submitted another request for an accommodation to work remotely, supported by environmental pulmonologist, Dr. Michael Harbut.  (ECF No. 38-17).  Dr. Harbut's certification stated: "Employee cannot do the work she is capable of doing in the workplace environment"; "The workplace environment exacerbates her pulmonary disease and conditions"; and "Employee should be allowed to refrain from entering the environment or staying in the environment which exacerbates her condition when she experiences a reaction."  The duration of Freeman's limitation was stated to be "unknown" *Id.*  LCG denied the request. (Raglin dep., 169-70).

Freeman then took an unpaid non-FMLA leave of absence under LCG's policy providing for 12 weeks of unpaid leave with no guarantee of reinstatement. On May 14, 2018, LCG informed Freeman that her position was filled by another worker.  Freeman was told that she could apply for a different position by May 25, 2018, otherwise she would be terminated from LCG as her 12-week unpaid leave of absence was set to expire on that date.  Freeman did not apply for another position and she was terminated by LCG on May 25, 2018.

Freeman contends that her manager Amanda Davis was not included in various meetings with Human Resources to discuss her request for accommodation.  She also contends that she is being treated differently than two

similarly situated, non-disabled, co-workers: Tiffany McKoy and Sandra McCloud. McKoy and McCloud are both Subsidy Operations Analysts, like Freeman, and both report to the same Novi-based manager as Freeman.  Unlike Freeman, both women live outside the Southeastern Michigan area and both are permitted to work remotely.

Ms. McKoy lives in North Carolina and worked for a company that was acquired by LCG in a merger.  LCG permitted McKoy to remain employed and permitted her to work from her home in North Carolina after they shut down the North Carolina office in 2008.  At first McKoy worked part of the time at the office and part of the time at home.  On January 1, 2009 she began to work full time from home.  (McCoy dep., 9-14).

Ms. McCloud moved from Southeastern Michigan to Texas in approximately September 2019 and since that time has been permitted to work two or three days a week at her home, alternating with working the other days at a school associated with LCG in Texas.  (McCloud dep., 26-32; Davis dep., 29-30).  McCloud was able to do this under the FlexWork Program, which LCG implemented on September 9, 2019, over a year after Freeman's employment was terminated.  (ECF No. 43-27, PageID 1971).

<u>STANDARD FOR SUMMARY JUDGMENT</u>

Federal Rule of Civil Procedure 56(c) empowers the court to render summary judgment "forthwith if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *See Redding v. St. Eward*, 241 F.3d 530, 532 (6th Cir. 2001). The Supreme Court has affirmed the court's use of summary judgment as an integral part of the fair and efficient administration of justice. The procedure is not a disfavored procedural shortcut. *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986); *see also Cox v. Kentucky Dept. of Transp.*, 53 F.3d 146, 149 (6th Cir. 1995).

The standard for determining whether summary judgment is appropriate is "'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" *Amway Distributors Benefits Ass'n v. Northfield Ins. Co.*, 323 F.3d 386, 390 (6th Cir. 2003) (*quoting Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986)). The evidence and all reasonable inferences must be construed in the light most favorable to the non-moving party. *Tolan v.* Cotton, 572 U.S. 650, 660 (2014); *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Redding*, 241 F.3d at 532 (6th Cir. 2001). "[T]he mere existence of

- 11 -

*some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986) (emphasis in original); *see also National Satellite Sports, Inc. v. Eliadis, Inc.*, 253 F.3d 900, 907 (6th Cir. 2001).

If the movant establishes by use of the material specified in Rule 56(c) that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law, the opposing party must come forward with "specific facts showing that there is a genuine issue for trial." *First Nat'l Bank v. Cities Serv. Co.*, 391 U.S. 253, 270 (1968); *see also McLean v. 988011 Ontario, Ltd.*, 224 F.3d 797, 800 (6th Cir. 2000). Mere allegations or denials in the non-movant's pleadings will not meet this burden, nor will a mere scintilla of evidence supporting the non-moving party. *Anderson*, 477 U.S. at 248, 252. Rather, there must be evidence on which a jury could reasonably find for the non-movant. *McLean*, 224 F.3d at 800 (*citing Anderson*, 477 U.S. at 252).

## ANALYSIS

## I.   Exhaustion of Administrative Remedies

The ADA requires an employee to exhaust her administrative remedies before a lawsuit can be maintained. To exhaust administrative remedies, a separate EEOC charge must be filed for each unlawful employment practice.

*Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 113-14 (2002).  Discrete acts, such as termination, failure to promote, denial of transfer, or refusal to hire constitute separate unlawful employment practices and are not actionable if time-barred, "even when they are related to acts alleged in timely filed [EEOC] charges."  *Id.* at 113.  "Each discrete discriminatory act starts a new clock for filing charges alleging that act."  *Id.*  Therefore, any allegation of a discrete act in violation of the ADA that was not included in Freeman's EEOC charge has not been exhausted and may not be pursued in this lawsuit.

The issue of exhaustion was previously raised by LCG in a motion for summary judgment filed on February 12, 2019 (doc. 10).  Freeman filed her EEOC charge on January 29, 2018, prior to her termination.  In her charge, plaintiff alleged a single violation of the ADA arising out of LCG's denial of an accommodation of plaintiff's disability on November 3, 2017.  The court initially granted partial summary judgment on Freeman's ADA claims that were not included in her January 29, 2018 charge (doc. 14).  The basis of the court's decision was that although Freeman later informed the EEOC investigator by email that she wanted to amend her charge to include retaliation and wrongful termination, and she received directions on how to make the amendment, she did not take the required action.  The court's ruling was that Freeman could not pursue her ADA claim based on wrongful termination or hostile work

environment, or disparate treatment that was not included in her charge, because she failed to administratively exhaust those claims.  Freeman filed a motion for reconsideration (doc. 16) which the court granted to permit discovery on the issue of whether she properly amended her original charge (doc. 18).

In the instant motion for summary judgment, LCG argues that with discovery now complete, Freeman has failed to produce any evidence that her charge included allegations of illegal termination, a hostile work environment, or any retaliatory actions.  In response to this argument, Freeman asserts that "[t]he issue of timeliness of Plaintiff's claims relative to filing and amending her EEOC complaint was decided in Plaintiff's favor previously by this court on June 19, 2019."  While the court decided the motion for reconsideration in Freeman's favor, this only granted her the opportunity to conduct discovery on the issue of exhaustion:  "the court is given pause in that discovery may have an impact on the factual issue of whether plaintiff amended her EEOC Charge."  (Doc. 18). The court reinstated Freeman's ADA claims and permitted the parties to take discovery, however the court did not make a finding on the ultimate issue of whether her ADA claims were timely.

When questioned on the issue during her deposition, Freeman admitted that she filed no subsequent charges or amendments regarding actions taken by LCG after January 29, 2018.  (Freeman dep. 28-29, 36-37).  Freeman has not

provided any other evidence showing that she in fact amended the original

charge.  Therefore, the court now finds that Freeman did not amend her original

charge and that her ADA claims related to allegations of illegal termination, a

hostile work environment, or any retaliatory actions that took place in response to

the filing of her charge, as well as any claims based on acts that were not

included in her charge, are barred for failure to exhaust and time-barred under

the 180-day contractual limitations period.[3]

## II.    Americans with Disabilities Act

### A.  Disability Discrimination

#### 1.   Prima Facie Case

To establish a prima facie case of disability discrimination, the plaintiff must

show: 1) she is disabled; 2) she is otherwise qualified for the position,  with or

without reasonable accommodation; 3) she suffered an adverse  employment

decision; 4) the decision-maker knew or had reason to know of her disability; and

5) the position remained open or a non-disabled person replaced her.

*Demyanovich v. Cadon Plating  & Coatings*, 747 F.3d 419, 433 (6th Cir. 2014).

In a disparate treatment claim, the plaintiff can satisfy the fifth element of the

prima facie case by showing that similarly situated non-disabled employees were

---

[3] The court's reasoning is explained in more detail in its May 23, 2019 opinion granting partial summary judgment (doc. 14).

treated more favorably.  *See Rosebrough v. Buckeye Valley High School*, 690

F.3rd 427, 431 (6th Cir. 2012) (citation omitted).

Here, LCG claims that Freeman cannot make the required showing that

she was "otherwise qualified" for the position or that similarly situated non-

disabled employees were treated more favorably.  At the root of LCG's argument

with regard to both elements is that throughout Freeman's employment, LCG

required in-person attendance of its Support Central employees.  Kathy Raglin,

described the policy as a "business philosophy" to have everyone in the

Southeastern Michigan area come to the Novi office in person so they could

collaborate with each other.  (Raglin dep., 23-24).

Freeman contends that when she was first hired as a Subsidy Operations

Analyst in 2011 there was not an in-person work requirement.  This requirement

was added as a bullet point to the Subsidy Operations Analyst job description in

2017.  (Raglin dep., 18-21).  Furthermore, Raglin acknowledged that at least four

employees other than Freeman worked remotely, though she did not appear to

know the details or circumstances of their situations.  (Raglin dep., 93-95).

Finally, Freeman points out that in September 2019, LCG officially adopted the

FlexWork Program, where it officially permitted a remote workforce.  (ECF No.

43-27, PageID.1967-1972).  In fact, the person who replaced her took advantage

of the program to work remotely.  Freeman maintains that she was able to do her

job remotely and the in-person requirement was not an essential function of her position.

To determine if Freeman is otherwise qualified for her position, she must show she can perform the essential functions of her job with or without an accommodation.  "A job function is essential if its removal would fundamentally alter the position."  *Mosby-Meachem v. Memphis Light, Gas & Water Div.*, 883 F.3d 595, 603 (6th Cir. 2018) (quoting *Kiphart v. Saturn Corp.*, 251 F.3d 573, 584 (6th Cir. 2001)).  Essential functions are the core job duties, not the marginal ones.  29 C.F.R. § 1630.2 (n)(1).  The analysis is fact specific.  Whether an in-person attendance requirement is an essential job duty requires the court to consider the employer's judgment, "written job descriptions prepared before advertising or interviewing" for the position, and the consequences of not requiring the employee to meet the requirement.  *See Hostettler v. Coll. of Wooster*, 895 F.3d 844, 854-55 (6th Cir. 2018).  The employer's judgment, while significant, may be outweighed by competing evidence put forth by the employee as the burden of making out a prima facie case is not onerous.  "At the summary judgment stage, the employer's judgment will not be dispositive on whether a function is essential when evidence on the issue is 'mixed.'"  *Rorrer v. City of Stow*, 743 F.3d 1025, 1039 (6th Cir. 2014) (citations omitted).  The Sixth Circuit has also acknowledged that written job descriptions are not dispositive and that

"[t]estimony from the plaintiff's supervisor that a job function is actually marginal may effectively rebut a written description that states that a job function is essential." *Id.* at 1040.

In this case, no evidence has been presented that Freeman did not perform the duties of her job satisfactorily while she was working remotely. Her manager was satisfied with her performance and testified that she did not oppose having Freeman continue working from home. There is no evidence that Freeman neglected any of her job duties or performed them at a subpar level. Nor is there any evidence that Freeman's absence from the office put additional strain on other employees. While the job description was changed to provide for in-person attendance in 2017, this was not a documented job requirement when Freeman was hired. Furthermore, other individuals with the same job title, albeit not located in Southeastern Michigan, worked remotely on a permanent basis. Freeman has presented a genuine issue of material fact whether in-person attendance was an essential function of her job

To show that similarly situated non-disabled employees were treated more favorably than she was, plaintiff must identify individuals who are similarly situated in all relevant respects. *Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 352 (6th Cir. 1998). Freeman identifies Tiffany McKoy, who lives in North Carolina but has been permitted to work from her home since 2009.

- 18 -

McKoy testified she has the same job classification as Freeman and the same Novi-based manager.  McKoy travels to Novi for meetings two or three times a year.  The Novi office is equipped with remote communication capabilities so she can communicate with manager Davis and the team remotely.  She testified that working remotely does not affect her ability to do her job and she has received positive performance evaluations.  McKoy services a multi-state area that does not include her place of residence, just as Freeman services a multi-state area that does not include Michigan.  Even after LCG inserted an in-person attendance requirement in the job description for Subsidy Operations Analyst in 2017, they continued to permit McKoy to work from home.

Freeman also identifies Sandra McCloud as a similarly situated non-disabled employee with the same job classification and same manager. McCloud moved from Southeastern Michigan to Texas in 2019 after she became engaged.  LCG permitted McCloud to continue in her position by working remotely under the FlexWork Program.  McCloud still reports to manager Davis, who she meets with by phone and other electronic means.  She is not required to attend meetings in Novi.  McCloud testified that working remotely does not affect her ability to do her job.

LCG argues neither McCloud nor McKoy are similarly situated to Freeman because they do not live in close proximity to the Novi office.  It would clearly be

impractical to impose the company's business philosophy of in-person attendance at Support Central on an employee who lives hundreds if not thousands of miles away.  However, those two employees hold the same position as Freeman, represent territories that do not include their place of residence, and are seemingly able to perform the essential job functions while working remotely. Another difference identified by LCG is that McCloud benefitted from the FlexWork Program that was implemented *after* Freeman was terminated.  The timing of the program does not necessarily defeat this element of Freeman's prima facie case.  The fact that the program was implemented after Freeman was terminated could support Freeman's position that in-person attendance was a marginal, rather than an essential, function of the job.

The Court finds that there is a genuine issue of material fact whether in-person attendance was an essential function of Freeman's job, and whether she was treated differently than similarly situated employees, for purposes of making out the elements of her prima facie case of disability discrimination.

## 2.  Legitimate, Non-Discriminatory Reason

Where a plaintiff establishes a prima facie case of disability discrimination, the burden shifts to defendant to articulate a legitimate, non-discriminatory reason for its decisions.  *Demyanovich*, 747 F.3d at 433.  LCG's legitimate, non-discriminatory reason for not permitting Freeman to work from home permanently

after the office renovation was complete is that it had an in-person policy that required all employees living in Southeastern Michigan to work at the Novi office. LCG has articulated a legitimate nondiscriminatory reason for its decision in this case.

### 3. Pretext

The burden then shifts back to plaintiff to prove that the legitimate reason given by the defendant employer was a pretext for discrimination. *Id.* A reason cannot "be a pretext for discrimination unless it is shown both that the reason was false, and that discrimination was the real reason." *Seeger v. Cincinnati Bell Tel. Co.*, 681 F.3d 274, 285 (6th Cir. 2012).

According to LCG, its policy requiring regular in-person attendance of its Southeastern Michigan employees at the Novi office remained the same throughout Freeman's entire employment. However, the evidence shows that the in-person work requirement was added to the Subsidy Operations Analyst job description in 2017, at the same time the office renovation was underway. This supports LCG's characterization that it was embracing a business philosophy of in-person collaboration. At the same time, the evidence supports a finding that the in-person work requirement was added to the Subsidy Operations Analyst job description six years after Freeman was hired into the position and almost a year

after she had been given permission to work from home during construction due to her disability.

From the evidence, there is an issue of material fact whether LCG's stated reason for not permitting Freeman to continue working from home after the renovation was complete was false. But Freeman must also present evidence to support a finding that the real reason was discrimination.

The only denial of an accommodation request that can support Freeman's disability discrimination claim is the one in October of 2017 because that is the only act she included in her EEOC charge. LCG explains that it accommodated Freeman's disability by allowing her to temporarily work from home during the renovation. However, once the renovation was complete, Freeman's request to work from home indefinitely was denied, consistent with its in-person work requirement.[4] Freeman counters with evidence that other, non-disabled, employees were permitted to work remotely on a permanent or indefinite basis. Freeman also disputes the characterization of her request as being indefinite or permanent where she requested to work from home for six months and always indicated a willingness to reevaluate her accommodation and return to the office once the air in the building no longer triggered her asthma.

---

[4] LCG argues that the same reasoning supports its termination of Freeman's employment, however this cannot form the basis of Freeman's claim since she failed to exhaust her administrative remedies by including her termination in her EEOC charge.

Based on the evidence, the court concludes that there is a genuine issue of material fact whether LCG had a legitimate reason for terminating plaintiff or whether the reason was pretext for discrimination.

Defendant's motion for summary judgment on plaintiff's claim of disability discrimination is denied.

B. Failure to Accommodate

To establish a prima facie case for failure-to-accommodate under the ADA, a plaintiff must show: 1) she is disabled; 2) she is otherwise qualified; 3) defendant knew or had reason to know of her disability; 4) she requested a reasonable accommodation; and 5) defendant failed to provide the reasonable accommodation. *Mosby-Meachem v. Memphis Light, Gas & Water Div.*, 883 F.3d 595, 603 (6th Cir. 2018). LCG disputes that Freeman is "otherwise qualified" for the position and that regardless, LCG offered a reasonable accommodation.

As discussed above, to be "otherwise qualified" for a position, the employee bears the burden of showing she can perform the "essential functions" of the job, with or without accommodation. *Id.* LCG argues that in-person work is an essential function of the position, so because she could not work at the Novi office, Freeman was not otherwise qualified for the job. The court has found that

Freeman has established an issue of material fact as to this element of her prima facie case.

If several reasonable accommodations are available, the employer has "ultimate discretion" to select the accommodation. *Trepka v. Board of Educ.,* 28 Fed. Appx. 455, 459-60 (6th Cir. 2002) (citing 29 C.F.R. § 1630.9(d)). So long as the accommodation provided is reasonable, summary judgment in favor of the employer is required. *Id.* at 460.

LCG maintains that it was responsive to Freeman's physicians' recommendations to eliminate agents from the work environment, including "mists, dust, fumes, vapors, smoke, volatile organic compounds." LCG removed aerosols from the office, offered Freeman an air purifier and extra cleaning of her workspace, and even provided her with a private office with new flooring. This accommodation was tested by Freeman when she returned to her newly renovated office on February 29 and March 2, 2018. However, Freeman reported experiencing shortness of breath and chest tightening after spending a short time in the office.

LCG argues that while working remotely was Freeman's preferred accommodation, LCG complied with its obligations under the ADA by offering a reasonable accommodation. Furthermore, LCG argue that an employer is not required to offer an accommodation of working remotely on an indefinite or

permanent basis. *Mosby*, 883 F.3d at 605; *Hostettler v. Coll. of Wooster*, 895 F.3d 844, 856 (6th Cir. 2018) ("[Plaintiff] never claimed, nor do we hold, that she had a right to perform her job on a part-time basis indefinitely."). It is true that Freeman never provided LCG with a hard end-date to her accommodation. However, she and her medical providers did explain that whatever was triggering her asthma could settle with time and no longer cause a problem.

The court finds there is a genuine issue of material fact whether the in-office accommodation offered by LCG was reasonable in this case. Defendant's motion for summary judgment on plaintiff's failure to accommodate claim under the ADA is denied.

C. Hostile Work Environment

To establish a hostile work environment claim under the ADA, plaintiff must prove: 1) she was a member of a protected class; 2) she was subjected to unwelcome harassment; 3) the harassment was based on her disability; and 4) the harassment had the effect of unreasonably interfering with her work performance and creating an objectively intimidating, hostile, or offensive work environment. *Plautz v. Potter*, 156 Fed. App'x 812, 818 (6th Cir. 2015); *Grace v. USCAR LLC*, 521 F.3d 655, 678 (6th Cir. 2008). LCG contends that Freeman cannot establish the second, third, and fourth elements of her prima facie case.

Freeman generally contends that in the period between filing her EEOC charge and her termination, her dealings with Kolodziej and Raglin "became increasingly acrimonious".  However, Freeman has not identified any derogatory comments made to her about her disability.  When asked to identify the specific actions she believed constituted "harassment," Freeman only identified interactions that were part of the interactive process. These examples include Raglin and Kolodziej's requests for multiple meetings to discuss Freeman's accommodation request and phone calls to Freeman's doctors seeking clarification of medical records.  These actions do not rise to the level of a hostile work environment.  *See Kleiber v. Honda of Am. Mfg., Inc.*, 485 F.3d 862, 871 (6th Cir. 2007) (to determine the appropriate reasonable accommodation, the employer may need to "initiate an informal, interactive process with the employee" to identify the "precise limitations" resulting from the disability and potential reasonable accommodations to overcome those limitations).

In addition, Freeman is foreclosed from bringing this claim as it was not part of her EEOC charge and it is also time-barred under the contractual limitations period.

Defendant's motion for summary judgment on plaintiff's hostile work environment claim under the ADA is granted.

## III.   FMLA Interference

To establish a claim for FMLA interference, Freeman must show: 1) she was an eligible employee; 2) LCG was a covered employer; 3) she was entitled to leave under the FMLA; 4) she gave LCG notice of her intent to take leave; and 5) LCG denied her FMLA benefits to which she was entitled.  *Tennial v. UPS, Inc.*, 840 F.3d 292, 307-308 (6th Cir. 2016).  "A benefit is denied if an employer interferes with the FMLA-created right to medical leave or to reinstatement following the leave."  *Id.* at 308.

LCG maintains that Freeman is unable to prove the fifth element of her prima facie case.  In fact, LCG approved numerous leaves under the FMLA for Freeman, both continuous and intermittent, and even offered her the ability to take a gratuitous non-FMLA leave after she exhausted all leave available to her under the FMLA.  Plaintiff's requests for FMLA leave were never denied.

Freeman does not respond to LCG's arguments for dismissal and the Court finds she has therefore abandoned her FMLA interference claim.  Fed.R.Civ.P. 56(e)(2); *Brown v. VHS of Michigan, Inc.*, 545 F. App'x 368, 372 (6th Cir. 2013) ("[A] plaintiff is deemed to have abandoned a claim when a plaintiff fails to address it in response to a motion for summary judgment.").

Summary judgment is granted in favor of defendant on plaintiff's FMLA interference claim.

## IV.    Retaliation Under ADA or FMLA

To establish a prima facie case of retaliation under either the ADA or the FMLA, Freeman must demonstrate: 1) she engaged in protected activity under either the ADA or FMLA; 2) the employer knew of that activity; 3) the employer took an adverse action against plaintiff; and 4) a causal connection existed between the protected activity and the materially adverse action.  *Rorrer*, 743 F.3d at 1046.  To establish a causal connection, "plaintiff must proffer evidence sufficient to raise the inference that her protected activity was the likely reason for the adverse action."  *Henderson v. Chrysler Grp., LLC*, 610 F. App'x 488, 494 (6th Cir. 2015).  A plaintiff must show some type of "retaliatory intent."  *Tennial*, 840 F.3d at 308.  LCG contends that Freeman cannot establish a causal connection between her protected activity and the denial of her accommodation request and subsequent termination.

Freeman filed her charge on January 29, 2018.  The evidence shows that LCG consistently denied Freeman's request for accommodation to work from home on a full-time basis since August 2017 as an unreasonable accommodation.  Where the same request was denied five months prior to the filing of the charge, the charge cannot be the "but for" cause of the denial of her accommodation request.  *Aldini v. Kroger Co. of Mich.*, 628 F. App'x 347, 352

(6th Cir. 2015) (holding there can be no causal connection where the alleged retaliatory action occurred prior to the alleged protected activity). Freeman's ADA retaliation claim based on any denial of an accommodation request made before she filed her charge is dismissed.

LCG also denied Freeman's subsequent request for accommodation to work remotely, which was supported by a certification from Dr. Harbut on March 2, 2018. LCG then terminated Freeman's employment on May 25, 2018 for failing to return to work in person at the end of her approved non-FMLA leave. Because these two adverse employment actions occurred after Freeman filed her EEOC charge, and were not included in her charge, they may not be considered as retaliation under the ADA.

The evidence also supports a finding that LCG approved all FMLA leave sought by Freeman for which she was entitled under the statute. LCG also approved Freeman's request for an additional 12 weeks of non-FMLA leave provided for under the employment agreement. Freeman has failed to demonstrate the causal connection required for a prima facie case of retaliation under the FMLA.

Defendant's motion for summary judgment on plaintiff's retaliation claim under both the ADA and FMLA is granted.

## CONCLUSION

For the reasons stated above, defendant's motion for summary judgment is GRANTED as to plaintiff's hostile work environment claim under the ADA, plaintiff's FMLA interference claim, and plaintiff's retaliation claims under the FMLA and ADA.  Defendant's motion for summary judgment is DENIED as to plaintiff's claims of disability discrimination and failure to accommodate under the ADA, consistent with this opinion.

Dated:  August 20, 2020

> s/George Caram Steeh
> GEORGE CARAM STEEH
> UNITED STATES DISTRICT JUDGE

---

CERTIFICATE OF SERVICE

Copies of this Order were served upon attorneys of record on August 20, 2020, by electronic and/or ordinary mail.

s/Brianna Sauve
Deputy Clerk

---